1  Georganne W. Bradley, Esq.                          **E-filed on May 12, 2011**
   Nevada State Bar No. 1105
2  KAEMPFER CROWELL RENSHAW
   GRONAUER & FIORENTINO
3  8345 West Sunset Road, Suite 250
   Las Vegas, NV 89113
4  Telephone: (702) 792-7000
   Facsimile: (702) 796-7181
5  Email:    gbradley@kcnvlaw.com

6
   Attorneys for Debtors and Debtors-in-Possession,
7  A-NGAE1, LLC

8              **UNITED STATES BANKRUPTCY COURT**

9                    **DISTRICT OF NEVADA**

10

11 In re:                                Case No. 10-18719-MKN

12 A-NGAE1, LLC, a Nevada limited liability    Chapter 11
   company,
13
                                         **DEBTOR'S BRIEF (1) CONCERNING THE**
14         Debtor.                       **ADEQUACY OF ITS DISCLOSURE**
                                         **STATEMENT AND (2) IN SUPPORT OF**
15                                       **CONFIRMATION OF DEBTOR'S**
                                         **AMENDED PLAN OF**
16                                       **REORGANIZATION DATED FEBRUARY**
                                         **17, 2011**
17
                                         Date:  May 18, 2011
18                                       Time:  11:00 a.m.

19         A-NGAE1, LLC, a Nevada limited liability company (the "Debtor"), the debtor and

20 debtor-in-possession in the above-captioned case, hereby submits this brief (the "Brief") (1)

21 Concerning the Adequacy of its Disclosure Statement for Debtor's Plan of Reorganization Dated

22 July 27, 2009 (the "Disclosure Statement") [Docket No. 40] and (2) in Support of Confirmation

23 of the Debtor's Amended Plan of Reorganization Dated February 17, 2011 (the "Amended Plan")

24 [Docket No. 42], and respectfully represents as follows:

25                         **PRELIMINARY STATEMENT**

26         N.G.A.#2, LLC, the parent of the Debtor (the "Parent"), borrowed $9,900,000 from a

27 group of more than 150 lenders (the "Lenders") through Aspen Financial Services, LLC (the

28

1    "Servicer") to acquire certain real property (the "Property") located in Clark County, Nevada.

2    Due to the dramatic downturn in the economy and the resulting collapse of the credit markets, the

3    Parent could no longer pay interest on the Note by February of 2008.  Despite substantial efforts

4    by the Parent to withstand the recession, the Parent is no longer able to fund any carry costs

5    associated with the Property.  The Parent and Servicer, after extensive negotiations, reached an

6    agreement that they believe is in the best interests of the Lenders and the Parent and will

7    maximize the value of the Property.  In short, they agreed that the Parent would form the Debtor

8    as a wholly-owned subsidiary of the Parent, transfer the Property to the new entity, and assign the

9    obligations under the Note to the new entity.  Thereafter, the Debtor would propose a

10   prepackaged plan of reorganization that would (a) convey the property to the Lenders in lieu of

11   foreclosure by making the Lenders equity owners of the Debtor, (b) provide the Parent with a

12   small residual interest in the Debtor in exchange for continuing to manage the Property, and (c)

13   establish a reasonable and fair mechanism for the Lenders to fund the carry costs associated with

14   the Property and make decisions concerning the Property, including decisions relating to potential

15   sales thereof.  The Amended Plan is the embodiment of this agreement.

16          The Debtor's Plan of Reorganization Dated July 27, 2009 (the "Original Plan") [Docket

17   No. 41] and the Disclosure Statement were sent to all Lenders and the Parent pre-petition.  The

18   Amended Plan was sent to all Lenders post-petition, together with a notice that explained the

19   changes made to the Original Plan and their impact on the Lenders.  The Disclosure Statement is

20   extensive and comprehensive.  The Amended Plan complies with Section 1129(a) of the

21   Bankruptcy Code.  It is the result of a transparent process and carefully balances the interests of

22   all parties.  The Plan was well received by the Lenders.  Indeed, more than 70% in number and

23   66% in amount of voting Lenders accepted the Plan.  Moreover, there was ample Lender

24   participation in the voting process – Lenders holding more than 86% of the beneficial interests in

25   the Note -- returned ballots.  Notice of the hearing on the adequacy of the Disclosure Statement

26   and confirmation of the Amended Plan was properly provided to all persons and entities on the

27   mailing matrix.  No objections to the Amended Plan or Disclosure Statement were filed.  For

28   these reasons, and the reasons stated below, the Debtor respectfully requests that the Court enter

1    an order finding that the Disclosure Statement contains adequate information and confirming the

2    Amended Plan.

3                                    **STATEMENT OF FACTS**

4    **A.    GENERAL BACKGROUND**

5            On or about July 11, 2006, the Parent of the Debtor financed the acquisition of the

6    Property by obtaining a $9,900,000 loan from the Lenders through the Servicer. The loan is

7    evidenced by a Promissory Note dated as of July 11, 2006 (the "<u>Note</u>") and is secured by a Deed

8    of Trust, Assignment of Rents, Security Agreement and Fixture Filing of even date therewith (the

9    "<u>Deed of Trust</u>") dated as of July 11, 2006. *See* Declaration of Thomas J. DeVore In Support of

10   Motion of the Debtor for Entry of an Order (A) Scheduling a Combined Hearing on the Adequacy

11   of the Disclosure Statement and Confirmation of Prepackaged Plan of Reorganization, (B)

12   Approving Procedures for Filing Objections Thereto, and (C) Approving the Form and Manner of

13   Notice of the Combined Hearing (the "<u>DeVore Declaration</u>"). [Docket No. 36]   The Property

14   consists of approximately 6.1 acres of vacant land, and was originally intended to be part of a

15   master planned community in Clark County to be known as Kyle Canyon Gateway North (the

16   "<u>Community</u>"), which is being developed by Focus Investment Group (the "<u>Developer</u>"), which

17   also owns a majority interest in the Parent. *See* DeVore Declaration. The Note is guaranteed by

18   John A. Ritter (the "<u>Guarantor</u>"), the indirect manager of the Parent. *See* DeVore Declaration.

19           By February of 2008, the Parent could no longer service the interest due to the Lenders

20   and defaulted on its obligations under the Note. At that time, the Parent believed that the credit

21   markets would soon improve and, therefore, requested that the Lenders agree to a three-year

22   forbearance agreement (18 month initial period with an option to extend for 18 months), whereby

23   the Parent or the Developer would continue to pay development and carry costs in connection

24   with the Property, but not interest on the Note. Interest would continue to accrue pending a sale

25   of the Property at the conclusion of the development of the Property. *See* DeVore Declaration ¶5.

26           Since that time, the real estate and credit markets have not improved and the Parent can no

27   longer fund such carry costs. Faced with this reality, the Parent began to negotiate with the

28   Servicer in early 2009 to further restructure its obligations in respect of the Note and the Property.

1   *See* DeVore Declaration ¶6.  In short, the parties agreed that it was in their best interests for the

2   Parent to form the Debtor as a wholly-owned subsidiary of the Parent and transfer the Property

3   and assign the obligations under the Note thereto, and for the parties to negotiate a prepackaged

4   plan of reorganization that would (a) convey the property to the Lenders in lieu of foreclosure, (b)

5   provide the Parent with a small residual interest in the Debtor in exchange for continuing to

6   manage the Property, and (c) establish a reasonable and fair mechanism for the Lenders to fund

7   the carry costs associated with the Property and make decisions concerning the Property,

8   including decisions relating to potential sales thereof.  *See* DeVore Declaration ¶7.

9          The parties believed that a prepackaged plan of reorganization was the best alternative for

10  maximizing value for several important reasons.  First, if the Lenders did not consensually

11  restructure the Note and, instead, foreclosed upon the Property, the Lenders would own the

12  Property as tenants-in-common, which is not feasible in light of the fact that there over 150

13  separate Lenders and it would be difficult to agree upon a mechanism for funding future carry

14  costs on the Property or on the appropriate terms upon which the Property could be managed,

15  and, ultimately, sold.  Further, it would be difficult for the majority Lenders to bind dissenters,

16  creating the potential for minority Lenders to obstruct commercially reasonable transactions to

17  the detriment of all of the Lenders.  Finally, in order for the Property to preserve its value, an

18  experienced real estate developer must perform the pre-development and entitlement work that is

19  necessary and reasonable to prepare the Property for sale and, where commercially practicable, to

20  improve the entitlement and master planning status for the Property.  The Lenders simply do not

21  have the expertise to do so.  The Parent and its affiliates, on the other hand, do.  A confirmed plan

22  of reorganization was the only manner to resolve all of these issues and maximize the value of the

23  Property.  *See* DeVore Declaration ¶8.

24         The Parent, the Developer, the Debtor, and the Servicer thereafter agreed upon the terms

25  of a plan of reorganization.  The terms are embodied in the Original Plan.  The Original Plan

26  resolves all of the issues described in the immediately preceding paragraph.

27

28

**B.    THE PLAN**

The terms of the Plan are simple.  On the Effective Date of the Plan, the Parent's equity interests in the Debtor will be cancelled and the Lenders will receive 100% of the Class A membership interests of the reorganized Debtor.  The Parent, in turn, will be issued 100% of the Class B membership interests.  The reorganized Debtor will then continue to manage, preserve, entitle and, ultimately, sell the Property.  Upon a sale, the Class A members (*i.e.*, the Lenders) will receive 90% of all distributions from the sale of the Property (after repayment of additional capital calls used to fund carry costs and entitlements, and a return thereon) until their allowed claims are paid in full, and 70% of the distributions thereafter.  The remaining distributions will be paid to the Parent as the Class B member.  With the exception of property tax claimants, which are unimpaired under the Plan, the Debtor has no other creditors other than the Lenders.

Importantly, the Plan also transfers governance to the Lenders.  After the Effective Date of the Plan, the reorganized Debtor will be governed by a new operating agreement (the "New Operating Agreement"), which is an exhibit to the Amended Plan.  Under the terms of the New Operating Agreement, the management of the reorganized Debtor will be vested in the Debtor's Manager and a "Steering Committee", which will be authorized to take all actions necessary and appropriate to carry out the business of the company except for certain "Major Decisions."  The Steering Committee will be comprised of five (5) individuals, four (4) of whom shall be appointed by the Lenders and one (1) of whom such shall be appointed by the Parent.  Major Decisions must be approved by 51% of the Class A membership interests (*i.e.*, the membership interests held by the Lenders) and include, without limitation, (a) any sale of the Debtor's assets, including the Property, (b) any financing, refinancing or acquiring of any material indebtedness by the reorganized Debtor, and (c) acquisition of any asset by the reorganized Debtor in excess of $50,000.

The day-to-day operations of the reorganized Debtor will be conducted, under the direction of the Steering Committee, by LEHM, LLC, a limited liability company established by the Parent (the "Manager"), which shall perform, at the expense of the Debtor, the pre-development and entitlement work that is necessary or reasonable to prepare the Property for sale

1    and, where commercially practicable, to improve the entitlement and master planning status of the

2    Property. The Manager will also market and sell the Property, at the expense of the Debtor and at

3    the direction of the Steering Committee, when commercially reasonable to do so, subject to the

4    approval of at least 51% of the Class A Membership Interests actually voting.

5         The operations of the reorganized Debtor will be funded on a going forward basis by

6    voluntary capital contributions from the Class A members on the terms and conditions set forth in

7    the New Operating Agreement. No Class A member will be required to make any capital

8    contributions, although additional capital contributions, plus a reasonable rate of interest, will be

9    returned on a priority basis to those Class A members who elect to contribute additional capital,

10    and Class A members who chose not to contribute will be assessed a corresponding amount of

11    interest as against their ultimate distributions upon the sale of the Property.

12         Finally, the Plan contains a release of claims against the Guarantor (the "Guarantor

13    Release") by all Lenders who vote in favor of the Plan. All Lenders that either voted against the

14    Plan or did not vote at all will not be subject to such release even if the Plan becomes effective.

15    This Court has previously expressed concern regarding the appropriateness of Section 5.5 of the

16    Plan, which includes provisions relating to the effect of Assembly Bill 513 (now codified at NRS

17    645B.340) on non-consenting Lenders. In this case, more than 51% in amount of the outstanding

18    principal balance of the Note voted to approve the Plan. *See* Certification of Acceptance and

19    Rejection of Debtor's Plan of Reorganization Dated July 27, 2009 (Ballot Summary) filed

20    contemporaneously herewith (the "Ballot Summary"), and the Declaration of Lisa Hall

21    Concerning Counting Ballots in Connection With Prepackages Plan of Reorganization (the "Hall

22    Declaration") [Docket No. 38]. Accordingly, the Debtor filed the Amended Plan on February 17,

23    2011 [Docket No. 42], in which Section 5.5 and all references to Assembly Bill 513 are deleted.

24    In addition, on April 5, 2011, the Debtor filed a Notice of (A) Filing of Debtor's Amended Plan

25    of Reorganization Dated February 17, 2011, and (B) Hearing to Consider the Adequacy of

26    Debtor's Disclosure Statement and Confirmation of Amended Plan of Reorganization Dated

27    February 17, 2011 (the "Notice of Amended Plan and Combined Hearing") [Docket No. 57]. The

28    Notice of Amended Plan and Combined Hearing included language that explains the changes

made to the Original Plan and its impact on the Lenders, and also provides all Lenders with an opportunity to object to such changes. Moreover, a redlined copy of the Amended Plan [Docket No. 43] was attached as an exhibit to the Notice of Amended Plan and Combined Hearing. The notice was served by electronic notice and by mail on all Lenders on April 7, 2011 and all others on the mailing matrix on April 12, 2011. *See* Certificates of Service filed on April 13, 2011 [Docket Nos. 61 and 62].

## C.    THE SOLICITATION

Prior to the Petition Date, the Debtor solicited the Plan as authorized by Section 1126(b) of the Bankruptcy Code. The Debtor, through Focus Management Services, prepared a solicitation package for each Lender containing (a) a cover letter, (b) the Disclosure Statement, (c) the Original Plan, (d) a ballot for each Lender (a "Ballot") and, (e) an envelope addressed to the Servicer, with prepaid postage for the Lenders to use to return their Ballots (collectively, the "Solicitation Package"), and thereafter sent the Solicitation Package to the Servicer for mailing *See* Declaration of Amanda Dalton in Support of Entry of an Order (A) Scheduling a Combined Hearing on the Adequacy of the Disclosure Statement and Confirmation of Prepackaged Plan of Reorganization, (B) Approving Procedures for Filing Objections Thereto, and (C) Approving the Form and Manner of Notice of the Combined Hearing (the "Dalton Declaration") [Docket No. 37]. The Servicer sent a Solicitation Package to each Lender on or about August 6, 2009. *See* Hall Declaration ¶9, Dalton Declaration ¶9, and Declaration of Jennifer Adams Concerning Service of Debtor's Plan of Reorganization and Related Documents (the "Adams Declaration"), ¶10 [Docket No. 44]. The Debtor believes that the solicitation was appropriate under the circumstances and in accordance with Bankruptcy Rule 2002(b).

The Servicer created an Excel spreadsheet, counted, and recorded the Ballots as they were received. *See* Hall Declaration ¶10. Ms. Hall reviewed each Ballot returned to the Servicer by a Lender. If the Ballot accepted the Plan, Ms. Hall made an entry on the spreadsheet reflecting that the Lender providing such Ballot had accepted the Plan, and noting the amount of the Lender's claim. If the Ballot rejected the Plan, Ms. Hall made an entry on the spreadsheet reflecting that

1   the Lender providing the Ballot had rejected the Plan and noting the amount of the Lender's

2   claim. *See* Hall Declaration ¶10.

3          The Debtor established September 5, 2009 as the deadline for receiving acceptances or

4   rejections in respect of the Plan. *See* Disclosure Statement, pg. 1. The Debtor believes that the

5   solicitation period was appropriate under the circumstances and was not unreasonably short as

6   prohibited by Rule 3018(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy

7   Rules"). Moreover, the terms of the Plan were negotiated with the Servicer, as the agent of the

8   Lenders, and, therefore, were well vetted prior to and during the solicitation of the Plan.

9          The Plan was well received by the Lenders. Indeed, more than 70% in number and 66%

10  in amount of voting Lenders accepted the Plan. Moreover, there was ample Lender participation

11  in the voting process—Lenders holding approximately 86.3% of the beneficial interests in the

12  Note returned Ballots. The Parent also accepted the Plan. The table set forth below contains the

13  final solicitation tally in respect of the Plan:

| Class | Number Accepting | Number Rejecting | Amount Accepting | Amount Rejecting |
|---|---|---|---|---|
| Class 1: Property Taxes | Unimpaired (Deemed to Accept) | N/A | N/A | N/A |
| Class 2: Lenders | 110 (70.51%) | 46 (29.49%) | $5,722,592 (66.95%) | $2,824.813 (33.05%) |
| Class 3: Parent | 1 | 0 | 100% | 0% |

*See* Hall Declaration, ¶11 and Exhibit A thereto [Docket No. 38] and Ballot Summary being filed

contemporaneously herewith.

       Under the Plan, only the Lenders (holders of the Note Claims), which are placed into

Class 2, and the Parent (holder of the Old Membership Units), which is placed in Class 3, are

impaired as that term is used by Section 1124 of the Bankruptcy Code. Class 1, which consists of

Property Tax Claims, will be paid in full on the Effective Date of the Plan and is not impaired,

and, therefore, is deemed to accept the Plan pursuant to Section 1126(f).

1

There are no rejecting classes in respect of the Plan.  Accordingly, confirmation pursuant

2

to section 1129(b) will not be necessary.

3

**D.   PROCEDURAL BACKGROUND AND DEADLINES RELATED TO CONFIRMATION**

4

On May 12, 2010 (the "Petition Date"), the Debtor filed a petition with this Court under

5

6

Chapter 11 of the Bankruptcy Code.  The Debtor is operating its business and managing its

property as a debtor-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy

7

Code.

8

The 341 Meeting of Creditors was held in this case on July 15, 2010.

9

On February 17, 2011, the Debtor filed the Disclosure Statement [Docket No. 40], the

10

Original Plan [Docket No. 41], and the clean and redlined versions of the Amended Plan [Docket

11

Nos. 42 and 43, respectively].

12

In addition, on February 17, 2011, the Debtor filed the Motion of the Debtor for Entry of

13

an Order (A) Scheduling a Combined Hearing on the Adequacy of the Disclosure Statement and

14

Confirmation of Prepackaged Plan of Reorganization, (B) Approving Procedures for Filing

15

Objections Thereto, and (C) Approving the Form and Manner of Notice of the Combined Hearing

16

(the "Scheduling Motion") [Docket No. 35], the Notice of Hearing on the Scheduling Motion

17

[Docket No. 39], the DeVore Declaration [Docket No. 36], the Dalton Declaration [Docket # 37],

18

the Hall Declaration [Docket No. 38], and the Adams Declaration [Docket No. 44].

19

On February 18, 2011, the Debtor served a copy of the Disclosure Statement, the clean

20

Amended Plan, and the redlined Amended Plan electronically and by mail on the United States

21

Trustee and the U.S. Securities and Exchange Commission.  *See* Certificate of Service [Docket

22

No. 46].  In addition, the Debtor served the Notice of Hearing on the Scheduling Motion on all

23

persons and entities on the mailing matrix, including those who requested special notice,

24

electronically and by U.S. Mail.  *See* Certificate of Service [Docket No. 47].  On February 23,

25

2011, counsel for the Servicer served the Notice of Hearing on the Scheduling Motion, by U.S.

26

Mail, on all Lenders.  *See* Certificate of Service [Docket No. 48].

27

28

1   At the hearing on March 23, 2010, this Court granted the Scheduling Motion.

2   Specifically, the Court granted the Debtor's request to set a combined hearing regarding the

3   adequacy of the Disclosure Statement and confirmation of the Amended Plan for May 18, 2011 at

4   11:00 a.m., and set a deadline of May 6, 2011 for filing objections to the Amended Plan and/or

5   the Disclosure Statement. The written order was entered on April 4, 2011 [Docket No. 54]. The

6   Debtor filed a Notice of Entry of the written order on April 5, 2011 [Docket No. 56], and served

7   the Notice of Entry of Order, with a copy of the written order, together with the aforementioned

8   Notice of Amended Plan and Combined Hearing, on all Lenders on April 7, 2011, and on all

9   other persons and entities on the mailing matrix on April 13, 2011 [Docket Nos. 61 and 62].

10   No pleadings in opposition to the Amended Plan and/or Disclosure Statement have been

11   filed.

## STATEMENT OF LEGAL AUTHORITIES AND ARGUMENT

**A.    THE DISCLOSURE STATEMENT CONTAINS ADEQUATE INFORMATION WITHIN THE MEANING OF SECTION 1125(A) OF THE BANKRUPTCY CODE**

Before the Court considers whether to confirm the Plan, the Debtor asks that this Court

find that the Disclosure Statement contains adequate information within the meaning of Section

1125(a) of the Bankruptcy Code. Section 1125(a) of the Bankruptcy Code defines "adequate

information" as:

> information of a kind, and in sufficient detail, as far as is reasonably
> practicable in light of the nature and history of the debtor and the
> condition of the debtor's books and records, including a discussion of the
> potential material Federal tax consequences of the plan to the debtor, any
> successor of the debtor, and a hypothetical investor typical of the holders
> of claims or interests in the case, that would enable such hypothetical
> investor of the relevant class to make an informed judgment about the
> plan. ...

11 U.S.C. § 1125(a)(1). "[T]he determination of what is adequate information is subjective and

made on a case by case basis. This determination is largely within the discretion of the

bankruptcy court." In re Brotby, 303 B.R. 177, 193 (9th Cir. BAP 2003) (citing In re Texas

Extrusion Corp.), 844 F.2d 1142, 1157 (5th Cir. 1988).

1  The Disclosure Statement in this case is extensive and comprehensive. It contains

2  descriptions of the Property and its encumbrances, the events leading up to this case, the Plan,

3  the means for implementing the Plan, the solicitation procedures, the risk factors affecting the

4  Plan, and a liquidation analysis. Moreover, a copy of the New Operating Agreement, which will

5  govern the management of the reorganized Debtor on and after the Effective Date, is attached to

6  the Plan and the Amended Plan and was distributed to all Lenders. *See* Dalton Declaration, Hall

7  Declaration, and Adams Declaration. [Docket Nos. 37, 38, and 44]. As noted above, the Lenders

8  and the Parent have clearly accepted the Plan. Accordingly, the Debtor submits that the

9  Disclosure Statement contains adequate information within the meaning of section 1125(a)(1)

10  and request that the Court grant its final approval of the Disclosure Statement.[1]

11  **B.    THE AMENDED PLAN COMPLIES WITH THE APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE AND SHOULD BE CONFIRMED**

12

13  **1.    The Amended Plan complies with Section 1129(a)(1) of the Bankruptcy Code.**

Pursuant to Section 1129(a)(1) of the Bankruptcy Code, a plan of reorganization must

14  comply with the applicable provisions of Chapter 11 of the Bankruptcy Code. 11 U.S.C.

15  § 1129(a)(1).[2] The legislative history of section 1129(a)(1) indicates that a principal objective of

16  this provision is to ensure compliance with the sections of the Bankruptcy Code governing

17  classification of claims and interests and the contents of a plan of reorganization set forth in

18  Sections 1122 and 1123 of the Bankruptcy Code. See S. REP. No. 95-989, 95th Cong., 2nd Sess.

19  1978 at 126 (1978); H.R. REP. No. 95-595 at 412 (1977). The Amended Plan complies with and

20  satisfies these provisions. Indeed, all creditors are properly classified and all similarly situated

21  creditors will receive the same treatment under the Amended Plan.

22

23  [1]    The Debtor submits its Disclosure Statement also complies with the "adequate information" requirement of Section 1126(b)(2). *See* 11 U.S.C. § 1126(b)(2).

24  [2]    To confirm the Amended Plan, the Debtor must demonstrate either that the Plan satisfies "all thirteen

25  requirements of 11 U.S.C. § 1129(a)" of the Bankruptcy Code by a preponderance of the evidence or, "if the only condition not satisfied is the eighth requirement, 11 U.S.C. § 1129(a)(8), [that] the plan satisfies the 'cramdown'

26  alternative to this condition found in 11 U.S.C. § 1129(b), which requires that the plan does not discriminate unfairly against and is fair and equitable towards each impaired class that has not accepted the plan." *See* Liberty Nat'l

27  Enters. v. Ambanc La Mesa Ltd. P'ship (In re Ambanc La Mesa Ltd. P'ship), 115 F.3d 650, 653 (9th Cir. 1997) (internal quotations omitted). The Debtor believes that all thirteen requirements are met and, as such, no cramdown is required.

28

1

2

3        **2.      The Amended Plan complies with Section 1122 of the Bankruptcy Code.**

4               Pursuant to Section 1122(a) of the Bankruptcy Code, a debtor is afforded significant

5        flexibility in classifying claims, provided there is a reasonable basis for the classification scheme

6        and all claims within a particular class are substantially similar.  *See* Barakat v. Life Ins. Co. of

7        Va. (In re Barakat), 99 F.3d 1520, 1524-5 (9th Cir. 1996) (noting that the following rules exist

8        regarding plan classification: "dissimilar claims may not be put in the same class" and a debtor

9        shall "not classify similar claims differently in order to gerrymander an affirmative vote on a

10       reorganization plan").

11              Under the Amended Plan, each class of claims and equity interests contains only claims or

12       equity interests that are substantially similar to the other claims or equity interests within such

13       class.  *See* Article 3 of the Amended Plan.  In addition, valid business, legal, and factual reasons

14       exist for the separate classification of each of the classes of claims and equity interests created

15       under the Amended Plan.  Property Tax Claims (as defined in the Amended Plan) are classified

16       separately because they are secured by senior liens on the Property.  Note Claims are classified in

17       a single class because the Lenders hold ratable beneficial interests in the Note and in the liens

18       securing the Note.  Finally, the equity interests of the Parent are classified in a separate class.

19       **3.      The Amended Plan complies with Section 1123 of the Bankruptcy Code.**

20              The Amended Plan complies with Section 1123(a) of the Bankruptcy Code, which sets

21       forth certain requirements with which every Chapter 11 plan must comply.  *See* 11 U.S.C. §

22       1123(a).  The Amended Plan fully complies with each such requirement.  First, the Amended

23       Plan designates classes of claims as required by Section 1123(a)(1) of the Bankruptcy Code.  *See*

24       Article 3 of the Amended Plan.  Second, the Amended Plan specifies which classes of claims and

25       equity interests are not impaired and sets forth the treatment for such classes as required by

26       Sections 1123(a)(2) and (3) of the Bankruptcy Code.  *See* Articles 3 and 4 of the Amended Plan.

27       Indeed, the Amended Plan specifies the treatment of all of the classes designated under the

28       Amended Plan, whether such classes are impaired or not.  *Id.*  Third, the Amended Plan provides

for the same treatment for each claim or interest within a particular class as required by Section 1123(a)(4) of the Bankruptcy Code. *See* Article 4 of the Amended Plan. Fourth, as described in more detail below, the Amended Plan provides for adequate means of implementation as required by Section 1123(a)(5). *See* Article 5 of the Amended Plan. Fifth, Section 1123(a)(6) of the Bankruptcy Code is inapplicable to the Amended Plan because the Debtor does not charge rates regulated by Governmental Units. Sixth, the Plan contains only provisions that are consistent with the interests of creditors and equity interest holders as required by Section 1123(a)(7). Finally, Section 1123(a)(8) is inapplicable to this case because the Debtor is not an individual.

In addition to the provisions required by Section 1123(a) of the Bankruptcy Code, the Amended Plan also contains a provision permitted by Section 1123(b) of the Bankruptcy Code. Specifically, the Amended Plan leaves certain classes of creditors unimpaired. *See* Article 3 of the Amended Plan. This provision of the Amended Plan is consistent with Section 1123(b) of the Bankruptcy Code and permissible under applicable law.

### 4.    The Amended Plan complies with Section 1129(a)(2) of the Bankruptcy Code.

Section 1129(a)(2) of the Bankruptcy Code requires that a plan proponent "compl[y] with the applicable provisions of [title 11]." 11 U.S.C. § 1129(a)(2). The legislative history to Section 1129(a)(2) explains that this provision incorporates the disclosure and solicitation requirements under Sections 1125 and 1126 of the Bankruptcy Code. See S. Rep. No. 95-989 at 126 (1978) ("Paragraph (2) [of Section 1129(a)] requires that the proponent of the plan comply with the applicable provisions of chapter 11, such as Section 1125 regarding disclosure"); H.R. REP. No. 95-595, at 412 (1977); see also In re Sierra-Cal, 210 B.R. 168, 176 (Bankr. E.D. Cal. 1997).

Section 1126(b) of the Bankruptcy Code provides that:

> a holder of a claim or interest that has accepted or rejected the Plan before the commencement of the case under this title is deemed to have accepted or rejected the Plan, as the case may be, if—(1) the solicitation of such acceptance or rejection was in compliance with any applicable nonbankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with such solicitation; or (2) if there is not any such law, rule, or regulation, such acceptance or rejection was solicited after disclosure to such holder of adequate information, as defined in section 1125(a) of this title.

11 U.S.C. § 1126(b). Rule 3018(b) qualifies section 1126(b) by providing some additional requirements. In particular, Bankruptcy Rule 3018(b) provides that:

> A holder of a claim or interest who has accepted or rejected a plan before the commencement of the case under the Code shall not be deemed to have accepted or rejected the plan if the court finds after notice and hearing that the plan was not transmitted to substantially all creditors and equity security holders of the same class, that an unreasonably short time was prescribed for such creditors, and equity security holders to accept or reject the plan, or that the solicitation was not in compliance with §1126(b) of the Code.

Fed. R. Bankr. Proc. 3018(b). Here, the Debtor prepared a Disclosure Statement containing adequate information in compliance with Section 1126(b) and transmitted it and other documents in the Solicitation Package to the Servicer. *See* Dalton Declaration. The Servicer mailed the Solicitation Package to all of the Lenders. *See* Hall Declaration and Adams Declaration. The Lenders were provided thirty (30) days to determine whether to vote to accept or reject the Plan. *See* Dalton Declaration, Hall Declaration, Adams Declaration, and Page 1 of the Disclosure Statement. By its terms, Rule 3018(b) merely requires that the plan be "transmitted" to substantially all creditors without dictating by whom or how such transmission should be accomplished. Accordingly, copies of the Solicitation Package were "transmitted" to substantially all of the Lenders and the solicitation procedures complied with Rule 3018(b).

**5.    The Amended Plan complies with Section 1129(a)(3) of the Bankruptcy Code.**

Pursuant to Section 1129(a)(3) of the Bankruptcy Code, a Chapter 11 plan may be confirmed only if it "has been proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3). "In this circuit, this requirement has been held to mean that '[a] plan is proposed in good faith where it achieves a result consistent with the objectives and purposes of the [Bankruptcy] Code. . . . The requisite good faith determination is based on the totality of the circumstances.'" In re Trans Max Techs., Inc., 349 B.R. 80, 88 (Bankr. D. Nev. 2006) (citing Platinum Capital v. Sylmar Plaza L.P. (In re Sylmar Plaza, L.P.), 314 F.3d 1070, 1074 (9th Cir. 2002), cert. denied, 538 U.S. 1035 (2003).

1    The primary goal of Chapter 11 is to promote the rehabilitation and reorganization of a

2  debtor's business through the restructuring of its debts and liabilities. In this case, the purpose of

3  the Plan is to restructure the Note by providing the Lenders with ownership of their collateral in a

4  structure that will maximize value and is highly preferable to foreclosure. *See* DeVore

5  Declaration [Docket No. 36]. This goal is consistent with the objectives of Chapter 11.

6    Further, in connection with its formulation of the Plan, the Debtor retained Valemount

7  Capital ("Valemount") to provide a valuation of the Property in connection with the liquidation

8  analysis attached as Exhibit B to the Disclosure Statement (the "Liquidation Analysis").

9  According to the Valemount analysis, the liquidation value of the Property is between $ 304,590

10  and $456,885, but if properly marketed and held over the next five to seven years, the Property

11  will have a value between $9,425,828 and $14,349,267, far in excess of the current liquidation

12  value.

13    Moreover, the Plan process has been transparent and consensual, arising through extensive

14  negotiations between the Parent and the Servicer. See DeVore Declaration [Docket No. 36].

15  This case was only commenced after the Debtor obtained sufficient consent from the Lenders to

16  engage in the Plan process.

17    In addition, the Guarantor Release provisions are voluntary and consensual. In the Ninth

18  Circuit, voluntary releases of third-party claims are permissible under the Bankruptcy Code.

19  Under applicable Ninth Circuit law. See In re Hotel Mt. Lassen, Inc., 207 B. R. 935 (Bankr. E.D.

20  Cal. 1997) ("Although the Ninth Circuit's decision in *Lowenschuss* and *American Hardwoods* do

21  not discuss the permissibility of purely consensual third-party releases, the logic of those

22  decisions does not preclude them. Moreover, such consensual arrangements are commonly

23  proposed in Ninth Circuit bankruptcy courts in connection with plans that are confirmed and,

24  perhaps because of the consensual nature of the releases, are rarely appealed.")

25    Accordingly, the Debtor submits that the Amended Plan satisfies the requirements of 11

26  U.S.C. § 1129(a)(3).

27    **6.    The Amended Plan complies with Section 1129(a)(4) of the Bankruptcy Code.**

28    Section 1129(a)(4) of the Bankruptcy Code requires that any payment "for services or for

costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to approval of, the court as reasonable." 11 U.S.C. § 1129(a)(4). "The requirements under § 1129(a)(4) are two-fold. First, there must be disclosure. Second, the court must approve of the reasonableness of payments." In re Beyond.com Corp., 289 B.R. 138, 144 (Bankr. N.D. Cal. 2003) (citing 7 COLLIER ON BANKRUPTCY ¶ 1129.03[4])).

Pursuant to Section 2.3 of the Amended Plan, each professional person who holds or asserts a Claim for Professional Fees is required to file with the Bankruptcy Court, and serve upon all parties required to receive notice, an application for Professional Fees within thirty (30) days after the Effective Date of the Amended Plan, which must be in compliance with all of the requirements of the Bankruptcy Code, the Bankruptcy Rules and any applicable guidelines and with all of the terms and conditions set forth in any applicable order of the Bankruptcy Court. This provision is sufficient to comply with Section 1129(a)(4) of the Bankruptcy Code.

**7.    The Amended Plan complies with Section 1129(a)(5) of the Bankruptcy Code.**

Section 1129(a)(5) of the Bankruptcy Code requires, among other things, that the plan proponent disclose the identity and affiliations of any individuals proposed to serve as a director, officer, or voting trustee of the debtor. 11 U.S.C. § 1129(a)(5). The Amended Plan transfers governance to the Lenders through the New Operating Agreement, which is an exhibit to the Amended Plan. Under the terms of the New Operating Agreement, the management will be vested in the Manager and the Steering Committee. Article 7 of the New Operating Agreement provides the mechanism for appointment of members to the Steering Committee. At or before the confirmation hearing, the Debtor will disclose the identity and affiliations of the members of the initial Steering Committee, to the extent the Debtor is able to obtain volunteers to serve on the initial committee. Pursuant to the New Operating Agreement, all but one of the members of the Steering Committee will be Lenders, having no affiliation with the Debtor. As such, they are well suited to represent the interests of the Lenders going forward. One member of the initial Steering Committee will be Thomas J. DeVore, the Chief Operating Officer of LEHM, LLC, a Nevada

corporation, the manager of the Debtor. Mr. DeVore is affiliated with the Parent and certain of its affiliates, including Focus Property Group. He has extensive real estate expertise and will provide important input to the committee. The primary task of the initial Steering Committee will be to elect a new Steering Committee after an election by the Class A Members of the Reorganized Debtor, in compliance with Article 7 of the New Operating Agreement. Appointment of the members of the Steering Committee in the manner set forth above and in Article 7 of the New Operating Agreement is consistent with public policy and therefore satisfies the requirements of Section 1129(a)(5).

### 8.    Section 1129(a)(6) of the Bankruptcy Code is inapplicable.

Section 1129(a)(6) of the Bankruptcy Code requires that any regulatory commission having jurisdiction over the rates charged by the debtor in the operation of its business approve any rate change provided for in the plan. 11 U.S.C. § 1129(a)(6). The Debtor, in the exercise of its business, does not charge any rates that are governed by this section. Therefore, the provisions of Section 1129(a)(6) are inapplicable.

### 9.    The Amended Plan complies with Section 1129(a)(7) of the Bankruptcy Code.

Section 1129(a)(7) of the Bankruptcy Code requires that a plan be in the "best interests" of creditors and interest holders. The "best interests" test requires that each holder of an impaired claim or interest either accept the plan or receive or retain property having a present value, as of the effective date of the plan, not less than the amount such holder would receive or retain if the debtor were liquidated in a hypothetical liquidation under chapter 7 of the Bankruptcy Code. See In re General Teamsters, Warehousemen & Helpers Union, Local 890), 265 F.3d 869, 877 (9th Cir. 2001); In re Marshall, 298 B.R. 670, 680 (Bankr. C.D. Cal. 2003).

In connection with the Disclosure Statement, Valemount created a liquidation analysis. See Exhibit B to Disclosure Statement. That analysis shows that the Property will be worth considerably more if the Debtor continues to develop the Property under the Plan than it would if liquidated in a Chapter 7. Indeed, Valemount estimated that the liquidation of the Property in a Chapter 7 liquidation would generate values of between $304,590 and $456,885, and distributions to Lenders of between $257,289.70 and $394,355.20. However, if the Property is reorganized,

developed and properly marketed for the next five to seven years, it could generate values of between $9,475,828 and $14,349,267 and distributions to Lenders between $8,516,013.10 and $12,234,973. Accordingly, the best interest of creditors test is satisfied. A detailed liquidation statement is attached to the Disclosure Statement.

**10.    The Amended Plan complies with Section 1129(a)(8) of the Bankruptcy Code.**

Section 1129(a)(8) of the Bankruptcy Code requires that each class of claims or interests either accept the plan or be unimpaired by the Plan. 11 U.S.C. § 1128(a)(8). Class 1 – Property Tax Claims is not impaired under the Amended Plan, and, therefore, is deemed to have accepted the Plan.

In determining whether an impaired class of claims has accepted the Plan, Section 1126(c) of the Bankruptcy Code requires that creditors accepting the Plan hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class voting to accept or reject the Plan. 11 U.S.C. § 1126(c). Moreover, in determining whether an impaired class of interests has accepted the Plan, Section 1126(d) of the Bankruptcy Code requires that interest holders accepting the Plan hold at least two-thirds in amount of the allowed interests of such class voting to accept or reject the Plan. 11 U.S.C. § 1126(d).

As set forth above, both Class 2 – Note Claims (the Lenders) and Class 3 – Old Membership Units (the Parent) voted to accept the Plan. Consequently, the Debtors submit that the requirements of section 1129(a)(8) have been met.

**11.    The Amended Plan complies with Section 1129(a)(9) of the Bankruptcy Code.**

Section 1129(a)(9) of the Bankruptcy Code requires that, unless the holder of a particular claim agrees to a different treatment of such claim, persons holding claims entitled to priority under section 507(a) shall receive specified cash payments under the plan as follows:

(A) with respect to a claim of a kind specified in section 507(a)(2) or 507(a)(3) of this title, on the effective date of the plan, the holder of such claim will receive on account of such claim cash equal to the allowed amount of such claim;

(B) with respect to a class of claims of a kind specified in section 507(a)(1), 507(a)(4), 507(a)(5), 507(a)(6), or 507(a)(7) of this title, each holder of a claim of such class will receive —

> (i) if such class has accepted the plan, deferred cash payments of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or
>
> (ii) if such class has not accepted the plan, cash on the effective date of the plan equal to the allowed amount of such claim . . .

11 U.S.C. § 1129(a)(9).

Article 2 of the Amended Plan treats the Claims identified above as required by the Bankruptcy Code.  Section 2.2 of the Amended Plan provides that each holder of an Allowed Administrative Claim shall be paid in full in cash by the Debtor on the later to occur of (a) the Effective Date; (b) the tenth (10th) day after such Administrative Claim is Allowed; and (c) such date as the holder of any such Administrative Claim and the Debtors may agree.  Further, the Debtor has no claims entitled to priority under sections 507(a)(4), (5), (6) or (7).  Accordingly, the Debtor submits that the requirements of section 1129(a)(9) of the Bankruptcy Code are met.

**12.    The Amended Plan complies with Section 1129(a)(1) of the Bankruptcy Code.**

Section 1129(a)(10) of the Bankruptcy Code requires the affirmative acceptance of a plan by at least one class of impaired claims, "determined without including any acceptance of the plan by any insider."  11 U.S.C. § 1129(a)(10).  As set forth above, Class 2 – Note Claims (the Lenders), which is an impaired non-insider Class under the Amended Plan, voted to accept the Plan.  Consequently, the Debtors believe that the requirements of Section 1129(a)(10) are met.

**13.    The Amended Plan complies with Section 1129(a)(11) of the Bankrutpcy Code.**

Section 1129(a)(11) of the Bankruptcy Code requires a specific finding that the Plan is "feasible" as a condition precedent to confirmation.  See Sherman v. Harbin (In re Harbin), 486 F.3d 510, 517 (9th Cir. 2007).  The statute requires this Court to determine that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan."  11 U.S.C. § 1129(a)(11).  The feasibility test requires this Court to make an independent determination as to whether the Plan is workable and has a reasonable likelihood of success.  See Computer Task Group v. Brotby (In re Brotby), 303 B.R.

1   177, 191 (9th Cir. BAP 2003); In re Sagewood Manor Assocs. Ltd. P'ship, 223 B.R. 756,

2   762 (Bankr. D. Nev. 1998). As stated by the Trans Max Technologies court:

3       In considering whether a particular plan is feasible, courts have considered the
        following factors:

4

5           (1) the adequacy of the debtor's capital structure;

6           (2) the earning power of its business;

7           (3) economic conditions;

8           (4) the ability of the debtor's management;

9           (5) the probability of the continuation of the same management; and

10          (6) any related matters which determine the prospects of a sufficiently
            successful operation to enable performance of the provisions of the plan.

11  349 B.R. at 92.

12      Of particular importance, it is clear that courts do not require a guarantee of success:

13          Basically, feasibility involves the question of the emergence of the
            reorganized debtor in a solvent condition and with reasonable

14          prospects of financial stability and success. *It is not necessary that
            success be guaranteed*, but only that the plan present a workable

15          scheme of organization and operation from which there may be a
            reasonable expectation of success.

16

17  7 COLLIER ON BANKRUPTCY ¶ 1129.LH[2], at 1129-203 (15th ed. Rev. 2005) (emphasis added).

18      After considering the aforementioned factors, the Debtor submits that the Amended Plan

19  is feasible. First, there is an adequate capital and governance structure to fund the Plan and the

20  Debtor's operations after the effective date of the Amended Plan. Article 4 of the New Operating

21  Agreement, attached to the Amended Plan, includes detailed procedures governing capitalization

22  of the reorganized Debtor. The operations of the reorganized Debtor will be funded on a going

23  forward basis by voluntary capital contributions from the Class A members on the terms and

24  conditions set forth in the New Operating Agreement. No Class A member will be required to

25  make any capital contributions, although additional capital contributions, plus a reasonable rate of

26  interest, will be returned on a priority basis to those Class A members who elect to contribute

27  additional capital, and Class A members who chose not to contribute will be assessed a

28  corresponding amount of interest as against their ultimate distributions upon the sale of the

1  Property. The Debtor believes that this financing structure is more than sufficient to fund the

2  reorganized Debtor's operations on a going forward basis and will most certainly enable the

3  Debtor to successfully reorganize.

4        Importantly, the alternative is for the Lenders to foreclose. In such a case, the Lenders

5  will own the Property as more than one hundred fifty (150) tenants-in-common and may very

6  well be unable to agree on a proper funding mechanism. Further, continuing entitlements in

7  respect of and marketing the Property will be difficult at best. The Amended Plan resolves all of

8  these issues by creating a financing and governance structure on a going forward basis.

9        Second, as stated above, the Property is worth substantially more if the Amended Plan is

10  confirmed and the Debtor reorganizes than if the Debtor is liquidated in a chapter 7 proceeding.

11  Third, although southern Nevada is facing a severe downturn in its real estate market and this

12  downturn has dramatically impacted the ability of borrowers to fund real estate developments and

13  refinance existing debt, the Amended Plan allows for sufficient time for economic conditions to

14  recover before the Property is monetized, maximizing value for the Lenders. Finally, the

15  Amended Plan transfers governance of the Debtor to the Lenders who are in the best position on

16  and after the Effective Date to determine what is in the economic best interests of the Debtor. For

17  each of the foregoing reasons, the Amended Plan is feasible.

18        **14.**   **The Amended Plan complies with Section 1129(a)(12) of the Bankruptcy Code**

19        Section 1129(a)(12) of the Bankruptcy Code requires that either all fees payable under

20  section 1930 of title 28 of the United States Code, as determined by the court at the Confirmation

21  Hearing, have been paid or that the Plan provides for the payment of all such fees on the Effective

22  Date of the Plan. 11 U.S.C. § 1129(a)(12). Section 13.9 of the Amended Plan provides for the

23  payment of all statutory fees by the Debtor on or before the Effective Date of the Amended Plan

24  and on a going forward basis. The Amended Plan, accordingly, satisfies Section 1129(a)(12) of

25  the Bankruptcy Code.

26        **15.**   **Section 1129(a)(13) of the Bankruptcy Code is inapplicable.**

27        Section 1129(a)(13) provides that a plan shall provide for the "continuation after its

28  effective date of payment of all retiree benefits, as that term is defined in section 1114 of [the

Bankruptcy Code], ... for the duration of the period the debtor has obligated itself to provide such benefits." 11 U.S.C. § 1129(a)(13).  The Debtor is not obligated to provide such retiree benefits and, thus, Section 1129(a)(13) is inapplicable.

**16.**     **Section 1129(a)(14) of the Bankruptcy Code is inapplicable.**

Section 1129(a)(14) only applies to an individual debtor who is obligated to make domestic support payment, and is therefore inapplicable in this case.

**17.**     **Section 1129(a)(15) of the Bankruptcy Code is inapplicable.**

Section 1129(a)(15) only applies to individual debtors and is therefore inapplicable in this case.

**18.**     **Section 1129(a)(16) of the Bankruptcy Code is inapplicable.**

Section 1129(a)(16) provides that all transfers of property of the Plan shall be made in accordance with any applicable provisions of nonbankruptcy law that govern the transfer of property by a corporation or trust that is not a moneyed, business, or commercial corporation or trust.  The Debtor is a for-profit Nevada limited liability company.  Accordingly, Section 1129(a)(16) is inapplicable in this case.

## CONCLUSION

For the forgoing reasons, the Debtor respectfully requests that the Court enter an order approving the Disclosure Statement and confirming the Amended Plan.

Dated this 12th day of May, 2011.

KAEMPFER CROWELL RENSHAW
GRONAUER & FIORENTINO

By: _Georgeanne W. Bradley_
Georganne W. Bradley, Esq. (NV # 1105)
8345 West Sunset Road, Ste. 250
Las Vegas, NV 89113

*Attorneys for Debtor and Debtor-in-Possession,*
*A-NGAEI, LLC*